UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

MELISSA K. BRABSON,                    )
                                        )
                Plaintiff,              )
                                        )
v.                                      )        No. 3:14-cv-336
                                        )
SEARS, ROEBUCK AND CO.,                 )
                                        )
                Defendant.              )

## MEMORANDUM OPINION

This matter is before the Court on Defendant's Motion for Summary Judgment [doc.

44], Defendant's Brief in Support of the Motion [doc. 45], and Plaintiff's Response in

Opposition to the Motion [doc. 52]. For the reasons herein, the Court will deny Defendant's

motion.

## I.    BACKGROUND

An African American woman, Plaintiff Melissa K. Brabson ("Ms. Brabson") was

an employee for Defendant Sears, Roebuck and Co. ("Sears"), beginning in August 1993.

[2015 Brabson Dep., doc. 44-1, at 56:6–8]. In October 2010, Ms. Brabson received a

promotion and became the department manager of "Brand Central"[1] at the Sears store

located at the West Town Mall in Knoxville, Tennessee. [*Id.* at 232:15–16]. As department

manager, she reported directly to the store manager, Tim Lockhart ("Mr. Lockhart"), [*id.*

at 73:6–10], a Caucasian, who reported to the district manager, Kevin Dornfeld ("Mr.

---

[1] Brand Central is a retail department, whose employees are involved in sales, including
the sale of appliances. [*See* Wiseman Dep., doc. 44-5, at 13:15–24].

Dornfeld"), [*id.* at 76:18–25, 77:1]. In April 2011, Mr. Lockhart assessed Ms. Brabson's performance in a year-end review, in which he assigned Ms. Brabson the rating of "Meets Expectations" in all areas, [Brabson 2010 Year-End Review, doc. 52-9, at 2], qualifying her as a "Contributor" in the workplace, [*id.* at 4]. He provided Ms. Brabson with direct feedback in the report as well. He lauded her as someone who "go[es] above and beyond" in her work, [*id.* at 5], but he also noted that she had room for improvement in some areas, [*id.* at 3–4].

Later in the same year, Sears required the employees in Brand Central to take on new responsibilities in addition to their existing responsibilities—namely "non-selling tasks," [2016 LeVan Dep., doc. 52-2, at 10:4], which included unloading trucks, posting signage throughout the store, and resetting the displays throughout the store, [*id.* at 10:1–5; 2012 Sims Dep., doc. 52-5, at 167:12]. A pair of employees in Brand Central, Adam LeVan ("Mr. LeVan") and Daryl Sims ("Mr. Sims"), developed concerns about these new responsibilities; they believed that Sears had an internal policy that limited the number of hours that Brand Central employees could devote to them. [*See* 2016 LeVan Dep. at 10:6–25, 11:1–25, 12:1–25, 13:1–25; 2012 Sims Dep. at 164:9–14]. They brought their concerns to Ms. Brabson, seeking clarification about Sears' policy—in particular about whether they were entitled to compensation if they allotted a certain number of hours to non-selling tasks. [2016 LeVan Dep. at 10:11–25, 11:1–25, 12:1–24; 2012 LeVan Dep., doc. 52-3, at 133:1–22; 2016 Sims Dep., doc. 52-4, at 16:3–25; 2012 Sims Dep. at 164:9–15, 173:19–25, 174:1–21]. Ms. Brabson discussed the policy with Mr. Lockhart. [Lockhart Dep., doc.

2

52-8, at 53:6–25, 54:1–18]. Ms. Brabson claims that Mr. Lockhart reacted with anger when she brought up the policy and Mr. LeVan and Mr. Sims' concerns about it. [2015 Brabson Dep. at 85:4–21; *see* 2012 Sims Dep. at 52:20–25].

In the summer of the same year, Mr. Lockhart terminated Mr. LeVan and Mr. Sims. [Lockhart Dep. at 35:7–9]. Mr. Lockhart fired Mr. LeVan for allegedly violating Sears' policy regarding the use of employee discount cards, [2012 LeVan Dep. at 133:23–25],[2] and he fired Mr. Sims for allegedly falsifying his timesheet, [2016 Sims Dep. at 29:20–22].[3] On October 11, 2011, Ms. Brabson testified as a witness for Mr. LeVan at his unemployment hearing. [Lockhart Dep. at 33:7–10; Lockhart E-mail, doc. 52-20, at 2; Hudson E-mail, doc. 52-21, at 2]. She testified that she knew of other employees who had violated Sears' discount-card policy but did not receive the same punishment as Mr. LeVan. [Lockhart Dep. at 35:10–20, 36:5–25; Lockhart E-mail at 2]. After Ms. Brabson testified at the hearing, Mr. Lockhart sent an e-mail to Mr. Dornfeld to address Ms. Brabson's testimony, [Lockhart Dep. at 36:17–25, 37:1–4; Lockhart E-mail at 2], and in the e-mail, he assured Mr. Dornfeld that he had not inconsistently enforced the policy, [Lockhart E-mail at 2].

---

[2] Sears' policy regarding the use of employee discount cards states: "All associates receive an associate discount card for their personal use. . . . Individuals who are not legal dependents of the associate, are **not** eligible for the associate discount. . . . Abuse of the associate discount privilege will result in discipline, up to and including termination of employment . . . ." [Sears Associate Handbook, doc. 44-1, at 117].

[3] Sears' policy regarding proper timekeeping states: "Altering, falsifying, or tampering with timekeeping records . . . may result in disciplinary action, up to and including termination." [*Id.* at 114].

In November, Mr. Lockhart called 88Sears, Sears' Ethics and Compliance Helpline, [*see* Sears Associate Handbook, doc. 44-1, at 102], and lodged a complaint against Ms. Brabson, claiming that she had posted "untrue statements . . . about [him]" on her Facebook page, [88Sears Summ. 1920831352, doc. 56-8, at 3]. During this call, Mr. Lockhart reported that Ms. Brabson had also posted some kind of "threat" on her Facebook page. [Lockhart Dep. at 65:5–25, 66:1–22]. Mr. Lockhart faxed a copy of Ms. Brabson's Facebook page to the consultants at 88Sears. [*Id.* at 66:4–5]. On the same day, about forty-five minutes later, Mr. Lockhart called 88Sears with another complaint about Ms. Brabson, [*id.* at 67:2–6], asserting that she had made a "misrepresentation about unemployment" at Mr. LeVan's unemployment hearing, [*id.* at 67:4–5]. The consultants from 88Sears reviewed the complaints and determined that Ms. Brabson had not violated any of Sears' policies. [88Sears Summ. 1920831352 at 3].

During the same month, Mr. Lockhart and Mr. Dornfeld placed Ms. Brabson on a Performance Improvement Plan ("PIP"),[4] after Mr. Lockhart had "walked Brand Central to verify that processes were being followed" and determined that the department suffered from several deficiencies. [2011 PIP, doc. 52-7, at 2]. A PIP is not permissible unless a manager first "discuss[es] and provide[s] coaching to the associate to rectify [performance-

---

[4] "The Performance Improvement Plan provides the Associate with an opportunity to improve his/her performance. During this process the Associate is expected and required to show measurable, sustained improvement illustrated in overall performance. While the intent is for the associate to successfully complete the Performance Improvement Plan process, the company reserves the right to take immediate action up to and including termination if sufficient improvement is not demonstrated." [2011 PIP, doc. 52-7, at 2].

related] issues." [*Id.* at 2]. According to Ms. Brabson's PIP, Mr. Lockhart broached performance-related issues with Ms. Brabson on October 14, 2011—three days after she had testified at Mr. LeVan's unemployment hearing. [*Id.*]. Although "[i]n general [a PIP] follows a 90 day timeline," Mr. Lockhart and Mr. Dornfeld assigned Ms. Brabson a review period of over seven months. [*Id.*].

In December, Mr. LeVan and Mr. Sims filed a federal lawsuit against Sears, bringing claims for retaliatory discharge under the FLSA. *See LeVan v. Sears, Roebuck, Co.*, No. 3:11-cv-578 (E.D. Tenn. Dec. 5, 2011).[5] In January 2012, a "conversation" took place involving Ms. Brabson, Mr. Lockhart, and Mr. Dornfeld. [*See* Second Hudson E-mail, doc. 52-10, at 2]. Mr. Dornfeld asked Ms. Brabson why Mr. LeVan used her as a witness at his unemployment hearing, and he posed questions to her about her testimony. [*Id.*]. Mr. Dornfeld then instructed Ms. Brabson to keep their discussion to herself. [*Id.*]. About a month later, Mr. Lockhart placed a third call to 88Sears, reporting Ms. Brabson for sexual harassment of one of the employees in her department. [88Sears Summ. 1920999753, doc. 54-1, at 2–5]. Concluding that the allegations against Ms. Brabson were "[u]nsubstantiated," 88Sears closed the matter. [*Id.* at 4]. Later in the year, Ms. Brabson testified at a deposition in Mr. LeVan and Mr. Sims' case. [*See* 2012 Brabson Dep., doc.

---

[5] Both parties have submitted depositions from this lawsuit to the Court, and the Court has relied on them in resolving Sears' Motion for Summary Judgment. *See Am. Towers LLC v. BPI, Inc.*, No. 12-139-ART, 2014 WL 7237980, at *5 (E.D. Ky. Dec. 17, 2014) ("[D]epositions taken for purposes of another case also may be utilized [for summary judgment motions]." (quotation omitted)); *see also Joseph v. ICG Castings, Inc.*, No. 1:07-cv-541, 2008 WL 5110550, at *5 n.4 (W.D. Mich. Dec. 2, 2008).

52-1, at 1–87]. A few days afterwards Mr. Lockhart sent an e-mail to Mr. Dornfeld, notifying him that Ms. Brabson had begun working longer hours. [Second Lockhart E-mail, doc. 52-11, at 2]. Mr. Lockhart wrote, "Don't know why she's doing this! To make up for the depo maybe?" [*Id.*].

In January 2013, Mr. Lockhart sent another e-mail to Mr. Dornfeld, explaining that attendance and tardiness had become issues for Ms. Brabson and that she had "moral problems," "is lost as a ball in high weeds," and "cannot do more than one thing at a time." [Third Lockhart E-mail, doc. 52-12, at 2].[6] Mr. Lockhart also wrote:

> Melissa just asked me to let her off Sunday and Monday for MLK Day!! It's Friday! Schedules [sic] been posted since Tuesday. I'm tempted to not change it. I understand the request but it is her responsibility to ask off in a timely manner. I'm off Sunday. Maybe I want to celebrate his day . . .

[*Id.*]. Mr. Lockhart began to use surveillance video to monitor the times when Ms. Brabson arrived at work. [Lockhart Dep. at 127:12–16]. One morning he sent an e-mail to both Mr. Dornfeld and Ms. Brabson, listing specific dates on which Ms. Brabson had recently been late to work, including the exact times of her arrivals. [Fourth Lockhart E-mail, doc. 52-13, at 2]. A few days later Mr. Lockhart sent another e-mail to Ms. Brabson and wrote: "Leaving early on Sunday? Permission from whom? Your associates were looking for you and I depended on you to be here." [Fifth Lockhart E-mail, doc. 52-13, at 4].

---

[6] Sears' policy regarding attendance states: "In general, regular and timely attendance is an essential function of all positions. It is the responsibility of every associate to report to work on time, work all scheduled hours, and notify the Company before the start of work if she/he is unable to report to work on time or at all." [Sears Associate Handbook at 114].

Mr. Lockhart met with Ms. Brabson to discuss her performance-related issues, and Ms. Brabson accused him of being a racist and discriminating against her because of the color of her skin. [88Sears Summ. 1921431374, doc. 56-3, at 4]. Mr. Lockhart reported the incident to 88Sears and sought guidance from their consultants about how to handle it properly. [*Id.*]. Around this time, Mr. Lockhart told Justin Wiseman ("Mr. Wiseman"), the assistant store manager, that he had to document every incident involving Ms. Brabson because she could "play the race card" against him. [Wiseman Dep., 52-14, at 66:21–25; 2015 Brabson Dep. at 188:16–25, 189:1–4].[7] A few months later Mr. Lockhart called 88Sears with another complaint about Ms. Brabson, after an employee informed him that Ms. Brabson had been texting her outside of work. [88Sears Summ. 1921600191, doc. 56-7, at 3].

Mr. Lockhart placed Ms. Brabson on a new PIP,[8] citing Ms. Brabson's failure to complete paperwork, failure to follow processes, failure to update reports, failure to maintain cleanliness and presentations in her department, and dishonesty. [2013 PIP, doc.

---

[7] At some point, Ms. Brabson told Mr. Wiseman that "she would use the race card," [Wiseman Dep. at 68:2], though Ms. Brabson avows that she "never told anyone that I would 'play the race card' against Sears or Tim Lockhart," [Brabson Aff., doc. 52-22, ¶ 2].

[8] Ms. Brabson had "successfully worked her way through" the previous PIP. [88Sears Summ. 1921431374 at 3].

52-15, at 2].[9] Although Ms. Brabson does not recall the date, she testified that Mr. Lockhart also placed another manager in the store, Olivia Hurley ("Ms. Hurley"), a Caucasian, on a PIP because of her failure to complete work-related tasks. [2016 Brabson Dep., doc. 44-2, 29:20–22, 32:5–25, 33:1–9].[10] Later, Mr. Lockhart evaluated Ms. Brabson's performance in a new year-end review, in which he lowered her rating in three categories, from "Meets Expectations" to "Needs Development." [Brabson 2012 Year-End Review, doc. 52-16, at 2]. Her overall rating dropped by about eighteen percent, from a numerical rating of 3.3 to 2.7, [*compare* 2010 Year-End Review at 4 *with id.* at 5], but she retained her rating as a "Contributor," [Brabson 2012 Year-End Review at 5]. Mr. Lockhart also evaluated Ms. Hurley's performance in a year-end review, assigning Ms. Hurley a numerical rating of 2.9, which qualified her as a "Contributor." [Hurley 2012 Year-End Review, doc. 56-5, at 5].

Mr. Lockhart had a follow-up discussion with Ms. Brabson about her PIP and addressed the areas in which she did and did not make progress. [2015 Brabson Dep. at 164:3–17]. He also notified Mr. Dornfeld that Ms. Brabson had "[t]alked to an attorney" because she believed that he was "out to get her." [Sixth Lockhart E-mail, doc. 52-23, at

---

[9] Mr. Wiseman, who previously worked under Ms. Brabson before receiving a promotion, testified that Ms. Brabson was "disorganized" and "would bring her personal life into the work atmosphere." [Wiseman Dep. at 14:8–19, 18:11, 13–14]. He also testified that he witnessed Ms. Brabson alter timesheets for habitually late employees. [*Id.* at 56:12–25, 57:1–7]. Ms. Brabson, however, testified that she told Mr. Lockhart she did not have "the proper equipment" to perform her obligations at work. [2016 Brabson Dep., doc. 44-2, at 48:17–25, 49:1]. For instance, she testified that the store's printer had been broken because of a previous power outage. [*Id.*].

[10] Mr. Lockhart denies that he placed Ms. Hurley on a PIP. [Lockhart Decl., doc. 44-6, ¶ 4].

2]. Less than a month later, Mr. Lockhart called 88Sears to complain about Ms. Brabson's "unsatisfactory performance." [88Sears Summ. 1921627378, doc. 56-9, at 2–3]. Mr. Lockhart then had a second follow-up discussion with Ms. Brabson about her PIP. [2015 Brabson Dep. at 260:21–23]. Soon afterwards, Mr. Lockhart prepared to-do lists for Ms. Brabson, [*see* To-Do Lists, doc. 52-13, at 6–11], who believed that they "were far in excess of what other managers were receiving" and meant to "get [her] to quit by bombarding [her] with list after list," [Brabson Aff., doc. 52-22, ¶ 5].

In a staff meeting, Mr. Lockhart asked everyone whether they agreed with the verdict in the Trayvon Martin-George Zimmerman case. [2015 Brabson Dep. 185:23–25, 186:1–9].[11] The only African American at the staff meeting, Ms. Brabson stated that she neither agreed nor disagreed with the verdict and questioned what it had to do with the meeting. [*Id.* at 186:2–3, 6–9]. Mr. Lockhart contacted 88Sears and requested "termination approval" for Ms. Brabson. [88Sears Summ. 1921627378 at 3]. Sears approached Ms. Brabson with a "Confidential Separation Agreement," in which it offered to place her on a twelve-week "severance-related leave of absence" with pay if she agreed to resign, not to take legal action, and to cooperate in Mr. LeVan and Mr. Sims's lawsuit. [Separation Agreement, doc. 52-18, at 2–3]. Ms. Brabson refused to sign the agreement, [2015 Brabson Dep. at 175:4–7], and in September 2013, Mr. Lockhart terminated her from Sears' employment, [2015 Brabson Dep. at 171:25, 172:1–10], a decision that he claims to have

---

[11] According to Ms. Brabson, Mr. Lockhart said, "Okay, let's go around the room to see who all's in agreement with the verdict of the Trayvon/Zimmerman case." [2015 Brabson Dep. 186:4–6].

made "because [Ms. Brabson] failed to meet the [PIP] guidelines," [Lockhart Decl., doc. 44-6, ¶ 3]. After departing from Sears, Ms. Brabson learned from a former co-worker that Mr. Lockhart had made racial slurs about her. [2015 Brabson Dep. at 191:5–21].

Ms. Brabson then brought this action against Sears, alleging (1) race and color discrimination under 42 U.S.C. § 1981, (2) race and color discrimination under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-401–4-21-1004, (3) retaliatory discharge under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201–219, and (4) common-law retaliatory discharge under Tennessee law. [*See* Second Am. Compl., doc. 39, at 10–16]. Sears now moves for summary judgment on all of Ms. Brabson's claims. [Def.'s Mot. for Summ. J. at 1–3].

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's case," *id.* at 325, at which point the nonmoving party, to withstand summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

10

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## III. ANALYSIS

Sears argues that it terminated Ms. Brabson for a legitimate and nondiscriminatory reason—her poor performance—without racial animus. [Def.'s Br. at 16–24]. Sears also maintains that it did not retaliate against Ms. Brabson because she did not engage in protected activity, and even if she did engage in a protected activity, she cannot establish the requisite causal connection between the protected activity and her termination. [*Id.* at 8–14]. In response, Ms. Brabson contends that Sears' reason for terminating her is pretextual and that genuine issues of material fact preclude summary judgment on each of her claims. [Pl.'s Resp. at 21–34].

11

### A. Race and Color Discrimination

Under 42 U.S.C. § 1981(a), "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." Similarly, under THRA "[i]t is a discriminatory practice for an employer to . . . [f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin[.]" Tenn. Code Ann. § 4-21-401(a)(1). When a court analyzes a claim for race and color discrimination under either § 1981 or the THRA, it applies the same standard to each—the familiar *McDonnell Douglas* burden-shifting framework[12] that governs claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(a)–2000(h)(6). *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 993 (6th Cir. 1999).[13]

---

[12] Courts also refer to this framework as the "*McDonnell Douglas-Burdine*" framework because in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), the Supreme Court clarified its holding in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000).

[13] Although semantical differences exist between "race" discrimination and "color" discrimination, *see Atkins v. Denso Mfg. Tenn., Inc.*, No. 3:09-CV-520, 2011 WL 5023392, at *9 (E.D. Tenn. Oct. 20, 2011), courts apply the *McDonnell Douglas* framework to each of these types of discrimination on a motion for summary judgment, likely because the two are not mutually exclusive, *see Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867–68 (6th Cir. 2001); *Brack v. Shoney's, Inc.*, 249 F. Supp. 2d 938, 947–51 (W.D. Tenn. 2003).

12

Under this framework, an employee faces the initial burden of making a prima facie showing of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). To establish a prima facie case, an employee must show by a preponderance of the evidence that "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated . . . nonminority employees for the same or similar conduct."[14] *McClain v. Nw. Cmty. Corrs. Ctr. Judicial Corrs. Bd.*, 440 F.3d 320, 332 (6th Cir. 2006); *see Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 258, 252–53 (1981). If the employee establishes a prima facie case, a "mandatory presumption of discrimination is created," and the burden shifts to the employer to propound a legitimate, non-discriminatory reason for its adverse action.[15] *Johnson*, 215 F.3d at 573 (citation omitted); *see Burdine*, 450 U.S. at 253.[16] If the employer carries this burden, the employee must then show by a preponderance of the evidence "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. 792, 804 (1973)). On a motion for summary judgment, sufficient evidence must

---

[14] "[T]his standard is not inflexible, as [t]he facts necessarily will vary in [cases involving racial discrimination]." *Burdine*, 450 U.S. at 253 n.6 (quoting *McDonnell Douglas*, 411 U.S. at 802 n.13).

[15] The presumption shifts only the burden of production, not the burden of persuasion, which remains with the employee. *St. Mary's Honor Ctr.*, 509 U.S. at 507. In other words, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253 (quotation omitted).

[16] When an employee establishes a prima facie case of discrimination, the defendant does not bear the burden of articulating a legitimate, non-discriminatory reason by a preponderance of the evidence but "only the burden of explaining clearly the nondiscriminatory reasons for its actions." *Burdine*, 450 U.S. at 260.

13

exist to create a genuine factual dispute at each stage of the *McDonnell Douglas* inquiry. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

An employee may prove a claim of discrimination through direct or circumstantial evidence, *see U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983) ("As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence."), but the *McDonnell Douglas* framework and its shifting burdens are "inapplicable where the plaintiff presents direct evidence of discrimination," *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (citation omitted). The term "direct evidence" means "evidence which, if believed, requires no inference to conclude that unlawful [discrimination] was a motivating factor in the employer's action." *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (citations omitted). A case involving direct evidence is "rare," *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998), and "generally consists of cases where the employer makes admissions of a discriminatory or retaliatory motive," *Mikols v. Reed City Power Line Supply Co.*, No. 1:07-CV-84, 2008 WL 2696915, at *4 (W.D. Mich. July 1, 2008) (citing *Imwalle*, 515 F.3d at 544). The Court finds no admission of this type in the record, and it therefore will apply the *McDonnell Douglas* framework to Ms. Brabson's claims of discrimination.

### 1. Prima Facie Showing

Sears argues that Ms. Brabson has not established a prima facie case of discrimination because she "has no evidence that similarly-situated individuals outside of her protected class were treated more favorably." [Def.'s Br. at 20]. In particular, Sears

14

claims that "Ms. Brabson fails to present any evidence that any similarly-situated non-African Americans or whites were treated more favorably." [*Id.* (footnote omitted)].

In *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992), the Sixth Circuit stated that "to be deemed 'similarly situated,'" two employees must have "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 583 (citations omitted). As one court noted, however, *Mitchell* "should not be read too broadly," *Moore v. City of Clarkesville*, No. 3:10-0141, 2011 WL 2938459, at *6 (M.D. Tenn. July 19, 2011), because the Sixth Circuit later recognized that "[c]ourts should not assume . . . that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the[ir] relevancy," *Ercegovich*, 154 F.3d at 352. In this vein, an employee must demonstrate only that she is similarly situated to another employee "in all *relevant* respects." *Id.* at 353. "[A]n exact correlation [is] not required by the law of this circuit," because "the prima facie showing is not intended to be onerous." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (citation omitted); *see Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (stating that an employee's prima-face burden under *Burdine* "requires less than a typical preponderance-of-the-evidence showing").

The issue of whether any two employees are similarly situated often presents a question of fact for the jury. *See Cork v. Mich. Parole Bd.*, No. 12-CV-11214, 2013 WL

15

409023, at *4 (E.D. Mich. Jan. 14, 2013); *Moore*, 2011 WL 2938459 at *6; *see also Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (stating that "whether two employees are similarly situated is ordinarily a question of fact" (quotation omitted)). If a reasonable jury could find that two employees are similarly situated, a court errs by granting summary judgment on the fourth prima-facie element. *See Jones*, 488 F.3d at 405 (observing that a jury question exists when "reasonable minds could differ as to whether a preponderance of the evidence establishes that [an employee] was treated more harshly than similarly situated employees" (quotation omitted)); *Campbell v. Univ. of Akron*, 211 F. App'x 333, 345–46 (6th Cir. 2006) (reversing a district court's award of summary judgment because a reasonable jury could have concluded that the employer had treated its only African American employee differently from similarly situated white employees); *see also Moore*, 2011 WL 2938459 at *7 (stating that although "there are some obvious dissimilarities between Plaintiff and his proposed comparators," a reasonable jury could determine that they are similarly situated).

Ms. Brabson provides the Court with sufficient evidence establishing that Sears treated her differently from Ms. Hurley, a nonminority employee with whom Ms. Brabson is similarly situated in all relevant respects. Ms. Brabson and Ms. Hurley were both managers under a common supervisor, Mr. Lockhart. [*See* 2016 Brabson Dep. at 29:20–25, 32:1–9; Lockhart Decl. ¶¶ 2–4]. Ms. Brabson cites evidence for her contention that he placed her and Ms. Hurley on a PIP for the same or similar conduct—their failure to perform work-related tasks. [*See* 2016 Brabson Dep. at 33:2–9; 2013 PIP at 2]. In addition,

16

the evidence shows that both Ms. Brabson and Ms. Hurley were subject to similar or identical standards of evaluation in their year-end reviews. Mr. Lockhart appears not only to have assessed their respective performances based on the same criteria but also to have provided them with the same descriptive rating, "Contributor," as well as overall numerical ratings that vary by only two tenths of a point. [*Compare* Brabson 2012 Year-End Review at 5 *with* Hurley 2012 Year-End Review at 5].

Yet Mr. Lockhart terminated Ms. Brabson because in his view she "failed to meet the [PIP] guidelines," [Lockhart Decl. ¶ 3], while apparently permitting Ms. Hurley to remain in Sears' employment. Although Sears contends that Ms. Brabson is mistaken—that Mr. Lockhart never placed Ms. Hurley on a PIP, [*id.* at ¶ 4]—the Court cannot resolve this factual question here by weighing the evidence, *Anderson*, 477 U.S. at 249. Instead, the Court's function is to decide whether this factual question is genuine—that is, whether the evidence would allow a reasonable jury to conclude that Sears treated Ms. Brabson more harshly than a nonminority employee who is similarly situated to her. Ms. Brabson points to sufficient evidence for this purpose, creating a genuine issue of material fact as to whether she suffered disparate treatment under § 1981 and the THRA. She has therefore made a prima facie showing.

### 2. *Legitimate, Non-Discriminatory Reason*

In the next stage of the *McDonnell Douglas* analysis, Sears must produce a legitimate, non-discriminatory reason for Ms. Brabson's termination. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006). Sears has satisfied this burden by producing

17

evidence that it dismissed Ms. Brabson based on her poor performance. *See Danzig v. Bio-Care, Inc.*, No. 1:09-CV-507, 2010 WL 3341507, at *8 (W.D. Mich. Aug. 20, 2010) (stating that evidence of "work performance problems" constitutes a legitimate, non-discriminatory reason for adverse employment action).

### 3. Pretext

Because Sears has provided the Court with evidence of a legitimate, non-discriminatory reason for Ms. Brabson's termination, Ms. Brabson must now show by a preponderance of the evidence that "the legitimate reason[] offered by [Sears] w[as] not its true reason[], but [was] a pretext for discrimination." *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 804). More specifically, Ms. Brabson must show both that Sears' stated reason is false and that discrimination is the actual reason for her termination. *St. Mary's Honor Ctr.*, 509 U.S. at 515. "'[I]n evaluating the relevancy of discriminatory remarks' as part of a pretext analysis," a court should consider the identity of the speaker and the substance of the remarks. *Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 404 (6th Cir. 2008) (quoting *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 665 (6th Cir. 1999) (Moore, J., dissenting))). If the remarks "were made by a person in a position to influence the alleged employment decision," they are relevant to an analysis of pretext, unless they are too isolated or ambiguous, and can be indicative of racial animus. *Clack*, 304 F. App'x at 404–05 (quoting *Hopkins*, 196 F.3d at 665 (Moore, J., dissenting)).

Sears maintains that Ms. Brabson falls short of meeting her burden because she cites no evidence showing that it had an intent to discriminate against her. [Def.'s Br. at 24].

18

Ms. Brabson, however, has submitted evidence showing that Mr. Lockhart made several remarks that were either tinged with racial undertones or racially inflammatory: (1) he made an offhand comment about Martin Luther King, Jr. Day in response to Ms. Brabson's request for the day off;[17] (2) he told the assistant store manager that Ms. Brabson would "play the race card";[18] (3) he required the attendees in  a staff meeting—including Ms. Brabson, who was the only African American in the meeting—to provide their opinion about the Trayvon Martin-George Zimmerman verdict; (4) he uttered racial slurs about Ms. Brabson after he terminated her. Because Mr. Lockhart was responsible for Ms. Brabson's termination, [*see* Lockhart Decl. ¶ 3], these remarks, particularly when the Court views them in the light most favorable to Ms. Brabson, are indicative of racial animus, *see Clack*, 304 F. App'x at 405. Ms. Brabson has therefore satisfied her burden of establishing that Mr. Lockhart's stated reason for terminating Ms. Brabson—failure to make sufficient progress on her PIP—is more likely than not an untrue reason and a pretext for discrimination. The Court will deny Sears' request for summary judgment on Ms. Brabson's claims under § 1981 and the THRA.

## B.  Retaliation under the FLSA

Under 29 U.S.C. § 215(a)(3), the FLSA's anti-retaliation provision, an employer cannot discharge an employee "because such employee has filed any complaint or

---

[17] This evidence comes from a source other than Ms. Brabson herself. [*See* Third Lockhart E-mail at 2].

[18] This evidence also comes from a source other than Ms. Brabson herself. [*See* Wiseman Dep. at 66:21–25].

instituted or caused to be instituted any proceeding under [the FLSA], or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." To establish a prima facie case of retaliation under the FLSA, an employee must prove that "(1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Adair v. Charter Cty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006) (citation omitted). The *McDonnell Douglas* framework applies to claims of retaliation under the FLSA, *id.*, unless direct evidence of a retaliatory motive is present in the record, *Trans World Airlines*, 469 U.S. at 121; *see Mikols*, 2008 WL 2696915 at *4 (stating that direct evidence "generally consists of cases where the employer makes admissions of a . . . retaliatory motive in the context of the challenged employment action" (citing *Imwalle*, 515 F.3d at 544)). The Court finds no direct evidence of a retaliatory motive in the record and will therefore apply the *McDonnell Douglas* framework to Ms. Brabson's claim of retaliatory discharge.

### 1. Prima Facie Showing

Sears points out that Ms. Brabson alleges that she engaged in three types of protected activities: (1) requesting clarification from Mr. Lockhart about whether Sears' policy entitled the employees in Brand Central to compensation for non-selling tasks; (2) testifying at Mr. LeVan's unemployment hearing; and (3) testifying at a deposition in Mr. LeVan and Mr. Sims' lawsuit. [Def.'s Br. at 8 (citing Second Am. Compl. ¶¶ 60–62, 66–

20

69)]. Sears argues that these actions do not constitute protected activity. [*Id.* at 8–11]. Sears

maintains that even if Ms. Brabson engaged in protected activity, she still cannot make a

prima facie showing of causation. In particular, Sears contends that Ms. Brabson's

termination "was completely unrelated" to her inquiry about Sears' policy or to her

testimony. [*Id.* at 13]. Sears claims that Ms. Brabson's poor performance "broke any casual

chain between any alleged protected activity and her termination." [*Id.*]. In addition, Sears

maintains that a causal connection is missing because the amount of time that passed

between Ms. Brabson's protected activities and termination is too long. [*Id.* at 12–14].

### i.  Protected Activity

Section 215(a)(3) contains four types of protected activities in which an employee

may engage: (1) filing a complaint, (2) instituting a proceeding or causing a proceeding

under the FLSA, (3) testifying in a proceeding under the FLSA, or (4) serving or preparing

to serve on an industry committee. *Kasten v. Saint-Gobain Performance Plastics Corp.*,

563 U.S. 1, 20 (2011) (Scalia, J., dissenting). Under the statutory language "filed any

complaint," an employee can trigger the FLSA's anti-retaliatory protection by making a

complaint that an employer has violated the FLSA. *Id.* at 7. A formal complaint is

unnecessary; the complaint can be unofficial or informal, and can even be oral. *Id.* at 14;

*EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 989 (6th Cir. 1992).

Whether written or oral, however, the complaint "must be sufficiently clear and

detailed for a reasonable employer to understand it, in light of both content and context, as

an assertion of rights protected by the statute and a call for their protection." *Kasten*, 563

U.S. at 14. In this vein, a complaint must be adversarial in nature, and "expressions of concern or discomfort or frustration" are insufficient. *Robinson v. Wal-Mart Stores, Inc.*, 341 F. Supp. 2d 759, 763 (W.D. Mich. 2004); *see Romeo Cmty. Schs.*, 976 F.2d at 989. In the case of an employee who is also a manager, several circuits, including the Sixth Circuit, have adopted a manager-specific rule known as "the manager rule," which holds managers to an even more scrupulous standard under § 215(a)(3) than lower-level employees:

> In order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.

*McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486–87 (10th Cir. 1996) (footnote omitted); *see Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 530, 531 (6th Cir. 2011) (determining that a manager must step "outside the realm of job performance" by making an assertion "in her own interest" or "in the interests of . . . employees," like the use of "threatening language" against the employer); *see also Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 787–88 (11th Cir. 2012); *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 627–28 (5th Cir. 2008); *EEOC v. BHE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998). In short, "it is the assertion of statutory rights (*i.e.*, the *advocacy* of rights) by taking some action adverse to the company . . . that is the hallmark of protected activity under § 215(a)(3)). *McKenzie*, 94 F.3d at 1486.[19]

---

[19] Sears does not mention the manager rule in its brief.

Contrary to Sears' argument, Ms. Brabson provides the Court with sufficient evidence establishing that she made adversarial assertions as well as engaged in activities that Sears perceived as a declaration of rights under the FLSA. Ms. Brabson testified at Mr. LeVan's unemployment hearing, which was "hosted by the state" and qualifies as a "proceeding" under § 215(a)(3),[20] and stated that she was aware of other employees who had violated the employee discount-card policy but did not suffer the same consequence as Mr. LeVan. [Lockhart E-mail at 2; Hudson E-mail at 2]. By providing this testimony on Mr. LeVan's behalf, Ms. Brabson assisted Mr. LeVan in asserting his rights under the FLSA. *See McKenzie*, 94 F.3d at 1486.[21] Sears knew of this testimony, documented it, and even saw the need to question Ms. Brabson about it. [Lockhart E-mail at 2; Second Hudson E-mail at 2]. Later, as a deponent in Mr. LeVan's suit against Sears, Ms. Brabson also testified that she herself was seeking an attorney because she "felt like [she] was being pointed at at the store." [2012 Brabson at 78:24–25; 79:1]. After the deposition, Sears became aware that Ms. Brabson had in fact "[t]alked to an attorney" because she believed that Sears was "out to get her." [Fifth Lockhart E-mail at 2]. Sears then offered Ms. Brabson paid leave if she agreed not to bring suit. [*See* Separation Agreement at 2–]. In short, the record evidence—namely Ms. Brabson's actions and Sears' awareness of and response to them—supports a prima facie showing that Ms. Brabson engaged in protected activity.

---

[20] *See generally Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 364 (4th Cir. 2000) ("[T]he 'proceeding' necessary for liability under the FLSA refers to procedures conducted in judicial *or administrative tribunals*." (emphasis added)).

[21] Mr. LeVan's lawsuit against Sears ultimately settled. *See LeVan v. Sears, Roebuck, Co.*, No. 3:11-cv-578 (E.D. Tenn. Dec. 5, 2011).

23

ii. Causation

At the summary judgment stage, an employee's "burden to show causation entails 'requiring the [employee] to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible.'" *Pettit*, 429 F. App'x at 533 (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). The evidence of a causal link can be direct or circumstantial evidence. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 305 (6th Cir. 2012).

The record contains sufficient evidence through which the Court can reasonably infer that a causal connection exists between Ms. Brabson's protected activities and termination. Ms. Brabson has presented evidence showing that: (1) Mr. Lockhart, before Ms. Brabson engaged in the protected activities, praised her as an employee who "go[es] above and beyond" in her work; (2) Mr. Lockhart reacted with anger when she brought up the policy and Mr. LeVan and Mr. Sims' concerns about it; (3) Mr. Lockhart reported her numerous times to 88Sears after she engaged in the protected activities; (4) Mr. Lockhart placed her on PIPs after she engaged in the protected activities; (5) Mr. Lockhart thought that she was trying to "make up" for engaging in the protected activities; (6) Mr. Lockhart lowered her rating in her year-end review in three categories, from "Meets Expectations" to "Needs Development," after she engaged in the protected activities; and (7) Sears asked her not to bring suit. To deaden the impact of this evidence, Sears places emphasizes on the issue of temporal proximity, but temporal proximity is only one circumstantial factor

24

that courts consider in determining whether a causal connection is present. *See Petit*, 429 F. App'x at 533; *see also Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013) ("[T]emporal proximity always plays a role in establishing a causal connection; [but] its significance depends on the context.").

Although a multiyear gap between an employee's participation in protected activity and an adverse employment action can sever the requisite causal connection, *see Fuhr*, 710 F.3d at 676, "longstanding Sixth Circuit precedent indicat[es] that the causation analysis reflects a court's assessment of the totality of the circumstances, rather than a bright line rule," *Mink v. Passport Health Commc'ns, Inc.*, No. 3:12-cv-00446, 2013 WL 4008705, at *13 (M.D. Tenn. Aug. 5, 2013). In this case, nearly two years passed between Ms. Brabson's testimony at Mr. LeVan's unemployment hearing and her termination, but the evidence supports a reasonable inference that Sears retaliated against her during this span. *See id.* (determining that "the record does contain evidence suggesting that, even five years later, [the employer] sought to retaliate against [the employee]"). For instance, the evidence indicates that during this timeframe Sears endeavored to avoid a claim of retaliation by driving Ms. Brabson to leave her job voluntarily—a result it tried to reach in multiple ways.

First, the evidence shows that Mr. Lockhart overwhelmed Ms. Brabson with work that the other managers were not receiving. [*See* To-Do Lists at 6–11]. Second, the evidence supports the reasonable inference that Mr. Lockhart hoped to break Ms. Brabson's spirit by placing her on a PIP that exceeded the customary length of time by more than two fold. [*See* 2011 PIP at 2]. Third, the evidence shows that Sears later tried to

25

entice Ms. Brabson to resign by offering her paid leave. [*See* Separation Agreement at 2]. In sum, based on the evidence, a reasonable factfinder could conclude that Sears relied on the passage of time merely as a pretense, during which it actually hoped to compel Ms. Brabson to quit her job. *See Mink*, 2013 WL 4008705 at *13 ("[A] rational factfinder could conclude [the employer] still harbored a grudge against [the employee] . . . notwithstanding the passage of time."). Ms. Brabson has therefore satisfied her burden of making a prima facie showing of causation.

### 2. *Legitimate, Non-Discriminatory Reason*

In the next stage of the *McDonnel Douglas* analysis, Sears must produce a legitimate, non-discriminatory reason for Ms. Brabson's termination. *Adair*, 452 F.3d at 491. Sears has satisfied this burden by producing evidence that it dismissed Ms. Brabson based on her poor performance. *See Danzig*, 2010 WL 3341507 at *8 (stating that evidence of "work performance problems" constitutes a legitimate, non-discriminatory reason for adverse employment action).

### 3. *Pretext*

Because Sears has provided the Court with evidence of a legitimate, non-discriminatory reason for Ms. Brabson's termination, Ms. Brabson must now show by a preponderance of the evidence that Sears' "proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Adair*, 452 F.3d at 489 (citation omitted). More specifically, Ms. Brabson must show that "(1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [the employer's] action, or (3) the

26

proffered reason was insufficient to motivate the action." *Id.* at 491 (quotation omitted). According to the Sixth Circuit, "the very definition of pretext" arises when "[t]he employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee." *Jones*, 488 F.3d at 408.

Sears argues that Ms. Brabson has furnished the Court with no "shred of objective evidence to challenge Sears' stated reason for terminating her" other than "her own personal belief that her termination was retaliatory," but in making this argument, Sears itself ignores the bulk of evidence in the record. [Def.'s Br. at 16]. After Ms. Brabson engaged in the protected activities, Sears placed her under scrutiny that appears to have been unprecedented for her during her previous eighteen years of employment. For instance, three days after Ms. Brabson testified at Mr. LeVan's unemployment hearing, Mr. Lockhart initiated the process that led to Ms. Brabson's first PIP. [*See* 2011 PIP at 2]. He also began to track Ms. Brabson's comings and goings by using surveillance footage. [Lockhart Dep. at 127:12–16]. During at least part of this period of unprecedented scrutiny, Mr. Lockhart mused about whether Ms. Brabson had begun to work longer hours to "make up for the depo," [Second Lockhart E-mail at 2], showing that he had Ms. Brabson's participation in protected activity on his mind, *see Taylor v. City of Gatlinburg*, No. 3:06-cv-273, 2008 WL 4057805, at *3 (E.D. Tenn. Aug. 26, 2008) (denying summary judgment because the plaintiff "ha[d] presented evidence that the [protected activity] was very much on [the decision-maker's] mind").

27

Combined with the prima facie evidence of causation, *see Pettit*, 429 F. App'x at 535–36 (stating that "evidence of causal connection at the prima facie stage is often probative of pretext also" (citation omitted)), Sears' scrutiny of Ms. Brabson—which occurred after her participation in the protected activities—establishes that Sears, more likely than not, "wait[ed] for a legal, legitimate reason to fortuitously materialize" so it could terminate her, *Jones*, 488 F.3d at 408; *see LeVan v. Sears, Roebuck & Co.*, 984 F. Supp. 2d 855, 868 (E.D. Tenn. 2013) ("[T]he Court finds that . . . there is a genuine issue of material fact as to whether [Sears'] stated reason for LeVan's termination was . . . pretextual."). Ms. Brabson has therefore shown by a preponderance of the evidence that Sears' reason for terminating her was a pretext for illegal conduct, and the Court will deny Sears' request for summary judgment on her claim of retaliation under the FLSA. *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004) (noting that "in discrimination and retaliation cases, an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage" (internal citation and citation omitted)).

## C. Retaliation under Tennessee Law

In Tennessee, a claim of retaliatory discharge can take one of two forms: statutory retaliatory discharge or common-law retaliatory discharge. *See Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 535–37 (Tenn. 2002); *see also Williams v. City of Burns*, 465 S.W.3d 96, 110 (Tenn. 2015) (explaining the differences between a common-law and statutory retaliatory discharge in Tennessee). To bring a common-law claim, a plaintiff must show:

28

> (1) that an employment-at-will relationship existed; (2) that he was discharged; (3) that the reason for his discharge was that he attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge him was his exercise of protected rights or his compliance with clear public policy.

*Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 528 (Tenn. 2006). A cause of action for common-law retaliatory discharge arose as an exception to Tennessee's employment-at-will doctrine, which allows an employer to terminate an employee for any cause or for no cause. *Guy*, 79 S.W.3d at 534–35; *see Franklin*, 210 S.W.3d at 530 ("[T]he law of retaliatory discharge stems from Tennessee public policy that an employee should not be placed in the moral, ethical and legal dilemma of being forced to choose between reporting or participating in illegal activities and keeping his job." (citations omitted)). Although important, common-law retaliatory discharge is a "very exceptional tort action," *Chism v. Mid-S. Milling Co.*, 762 S.W.2d 552, 556 (Tenn. 1988), *superseded by statute*, Tenn. Code Ann. § 50-1-304(g), *as recognized in Williams v. City of Burns*, 465 S.W.3d 96, 109–110, 110 n.11 (Tenn. 2015) (stating that Tenn. Code. Ann. § 50-1-304(g) "essentially codified the common-law cause of action for retaliatory discharge"),[22] and is permissible only in "limited," "narrow" circumstances, *Franklin*, 210 S.W.3d at 530 (quotation omitted).

---

[22] Tenn. Code. Ann. subsection 50-1-304(g) states that "[t]his section abrogates and supersedes the common law with respect to any claim that could have been brought under this section." This provision applies to all actions accruing on or after July 1, 2014, *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 n.2 (Tenn. 2015), and therefore does not affect Ms. Brabson's claim for common-law retaliation, *see Weber v. Moses*, 938 S.W.2d 387, 393 (Tenn. 1996) (describing the events that trigger the accrual of an action for retaliatory discharge).

To be liable for common-law retaliatory discharge, an employer "must violate a clear public policy" in the State of Tennessee or at the federal level, *Chism*, 762 S.W.2d at 556; *see Nollner v. S. Baptist Convention, Inc.*, 852 F. Supp. 2d 986, 1000 (M.D. Tenn. 2012) ("Tennessee retaliatory discharge claims may be premised on federal policy violations."). An employee must identify a constitutional, statutory, or regulatory provision that serves as "evidence of a clear expression of a public policy." *Guy* 79 S.W.3d at 537; *Chism*, 762 S.W.2d at 556. On a motion for summary judgment, a court discerns public policy "from the constitution and the laws, and the course of administration and decision," *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn. 1997) (quotation omitted). In doing so, a court must "examine the statutes . . . cited in [the] . . . complaint to determine whether they evidence a clear expression of an important public policy." *VanCleave v. Reelfoot Bank*, No. W2008-01559-COA-R3-CV, 2009 WL 3518211, at *5 (Tenn. Ct. App. Oct. 30, 2009).[23]

---

[23] Tennessee's courts recognize that a claim for retaliatory discharge can be either a refusal-to-participate claim, under which the employee has refused to participate in the employer's illegal activities, or a whistleblowing claim, under which the employee has refused to remain silent about the employer's illegal activities. *VanCleave*, 2009 WL 3518211 at *7. "For both types of claims, the illegal activities must implicate important public policy concerns evidenced by an unambiguous constitutional, statutory, or regulatory provision." *Id.* at *8 (citation omitted).

The Tennessee Supreme Court has held that the *McDonnell Douglas* framework is inapplicable at the summary judgment stage because it is "incompatible with Tennessee summary judgment jurisprudence" dealing with Tennessee Rule of Civil Procedure 56. *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 785 (Tenn. 2010). Because *Gossett* requires courts, however, to resolve retaliatory discharge claims "in accordance with Tennessee Rule of Civil Procedure 56," *id.* at 786 (citation omitted), which is a state procedural rule, this Court is not bound by its holding, *see Boges v. Gen. Motors Co.*, 808 F. Supp. 2d 1043, 1051 (M.D. Tenn. 2011) ("*McDonnell Douglas* [i]s still the appropriate standard for federal district courts in Tennessee to apply because *Gossett* announced a state procedural rule, not a substantive rule that would be applied by a federal court sitting in diversity." (citations omitted)); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 437 (2010) ("'Under the *Erie* doctrine,' it is long settled, 'federal courts sitting in diversity apply state substantive law and federal procedural law.'" (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996))). The *McDonnell Douglas* framework therefore applies to Ms. Brabson's common-law retaliatory discharge claim.

Sears argues that it is entitled to summary judgment on Ms. Brabson's claim for retaliatory discharge because this claim implicates only "an internal management and policy issue," rather than an important public policy. [Def.'s Br. at 11]. In the Second Amended Complaint, Ms. Brabson identifies the FLSA as the source of public policy associated with her claim: "Plaintiff Brabson exercised her statutory rights under the

FLSA . . . . in furtherance of clear public policy." [Second Am. Compl. ¶¶ 66–67]. On more than one occasion, this Court and other courts in this circuit have stated that a clear public policy underlies the FLSA. *See Bartlow v. Grand Crowne Resorts of Pigeon Forge*, No. 3:11-CV-400, 2012 WL 6707008, at *2 (E.D. Tenn. Dec. 26, 2012) ("Employees are guaranteed certain rights by the FLSA, and public policy requires that these rights not be compromised . . . . " (quoting *Crawford v. Lexington-Fayette Urban Cty. Gov't*, No. 06-299-JBC, 2008 WL 4724499, at *2 (E.D. Ky. Oct. 23, 2008))). In fact, this Court addressed the same argument from Sears in Mr. LeVan and Mr. Sims' lawsuit:

> [T]here is a clear public policy, embodied in the FLSA and other legislation concerning employee rights, in favor of encouraging employees and others to ensure that employers comply with laws governing employment. . . . [Sears] . . . argues that plaintiffs' complaints merely pertained to Sears' internal policies, rather than a public concern. Yet, the important public interest furthered by the FLSA and the common law of retaliatory discharge is that employees have the right to lodge complaints and inquire as to the legality of employment practices . . . .

*LeVan*, 984 F. Supp. 2d at 871; *see generally Guy*, 79 S.W.3d at 538 (relying on common law to determine that a statute embodied "a clear declaration of public policy"). Ms. Brabson has therefore made a prima face showing that a clear and important public policy backs her common-law claim for retaliatory discharge. The Court has no need to address the final two stages of the *McDonnell Douglas* framework, and it will deny Sears' request for summary judgment. *See LeVan*, 984 F. Supp. 2d at 871 ("As for the final two stages of the *McDonnell Douglas* framework, because this inquiry has already been detailed in the Court's analysis of the FLSA claims, the Court will not repeat it here.").

## IV. CONCLUSION

Ms. Brabson has satisfied her burden under the *McDonnell Douglas* framework and may therefore proceed to a factfinder with her claims under § 1981, the THRA, the FLSA, and Tennessee common law. Sears' Motion for Summary Judgment [doc. 44] is **DENIED**. The Court will enter an order consistent with this opinion.

**IT IS SO ORDERED.**

ENTER:

_____
s/ Thomas W. Phillips
United States District Judge